United States District Court
Southern District of Texas

**ENTERED**

February 22, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOE RICHARD "TREY" POOL, III, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-2236 |
| | § | |
| CITY OF HOUSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Plaintiffs Trent Pool, Trey Pool, and Paul Jacob want to circulate petitions to place initiatives and referenda on City of Houston election ballots. The Houston City Charter allows only "qualified voters" to sign and circulate petitions. *See* HOUSTON, TEX., CITY CHARTER, art. VII-b, §§ 2(a) (initiative), 3 (referendum); art VII-a, § 3. A "qualified voter" must be both a resident of Houston and registered to vote in Houston. The plaintiffs are neither. Under the Charter, they cannot circulate petitions in Houston.

The plaintiffs argue that the Houston Charter unconstitutionally prohibits them from circulating petitions, with no compelling reason to do so. The plaintiffs rely on *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999), which held unconstitutional a Colorado law requiring petition circulators to be registered voters in Colorado. The Court held that the registration requirement burdened "political speech," in violation of the First Amendment. The plaintiffs seek an injunction and a declaratory judgment that the City of Houston has, through its Charter, violated the First and Fourteenth Amendments by requiring circulators to be qualified voters, even though the Supreme Court held a similar law unconstitutional 20 years ago.

The defendants—the City of Houston and the Secretary of the City of Houston (together the "City")—agree with the plaintiffs that the qualified-voter requirement is unconstitutional. In response to this lawsuit, the City Council enacted Ordinance 2020-1033. That Ordinance states that "the City of Houston accepts petitions circulated by individuals who are not registered to vote in the City, provided the circulators complete the 'Affidavit for Circulators Who Are Not Registered Voters of the City of Houston.'" (Docket Entry No. 95, at 14). The Affidavit form states that an individual "who is not registered to vote in the City of Houston" may circulate petitions in Houston, provided that he or she: (1) agrees to "subject [him or herself] to the jurisdiction of the Courts of Texas in connection with any allegation of fraud or misrepresentation associated with the circulation of any initiative, referendum, or recall petition or the collection of signatures for any initiative . . . in the City of Houston"; (2) represents that he or she has "never been convicted of the crimes of fraud or misrepresentation"; and (3) agrees to "make [himself or herself] available in person in Houston, at [his or her] own expense, within 72 hours of a request by the City of Houston concerning matters encompassed by [the] affidavit." (*Id.*, at 15).

The City argues that the plaintiffs' claims for declaratory and injunctive relief are moot because the newly enacted Ordinance ensures that the City will not enforce the allegedly unconstitutional Charter provisions. The plaintiffs disagree. They argue that the City Council did not have the authority to enact an ordinance that conflicts with the City's Charter, and that an invalid ordinance does not moot their claims. The plaintiffs also argue that—even if the Ordinance is valid—the Ordinance's requirements for nonregistered voters to appear in person within 72 hours of a City request imposes an unconstitutional burden on the plaintiffs' ability to circulate petitions. The plaintiffs also dispute the validity of the Ordinance provision that requires them to

2

swear that they have never been convicted of crimes of fraud or misrepresentation. The plaintiffs also seek nominal damages, and one plaintiff, Liberty Initiative Fund—an organization that helps to circulate petitions—seeks compensatory damages.

The City of Houston moved to dismiss the plaintiffs' second amended complaint. (Docket Entries Nos. 65, 68). The plaintiffs responded and moved for summary judgment on their claims for declaratory and injunctive relief. (Docket Entries Nos. 76, 85). Based on the motions, responses, and replies, the record, and the applicable case law, the City's motion to dismiss is granted in part and denied in part, and the plaintiffs' motion for summary judgment is granted in part and denied in part.

The court holds as follows:

- The plaintiffs' claims for declaratory and injunctive relief are not moot, because the City has not met its heavy burden of demonstrating that there is no reasonable possibility that the City will enforce the qualified-voter Charter provisions in the future.

- The plaintiffs have not demonstrated a need for injunctive relief, because there is no immediate threat that the City will enforce the Charter provisions against them. Instead, this court grants declaratory relief that the challenged Charter provisions are unconstitutional. This declaration will give the City an opportunity to enact or revise its current Ordinance, if it chooses.

- The plaintiffs' state-law claim that the City Council violated the Texas Local Government Code by enacting Ordinance 2020-1033 is dismissed for lack of Article III standing.

- The plaintiffs' constitutional challenges to Ordinance 2020-1033 are dismissed, without prejudice. The City must inform the court and the plaintiffs if it intends to amend or enact a new ordinance in light of this opinion, by no later than **April 18, 2022**. The plaintiffs may amend their complaint with 21 days of the City's enactment of a new ordinance, if any, to raise any claims related to that ordinance.

- The plaintiffs' claim for nominal damages is dismissed, because the plaintiffs have not plausibly alleged that their speech was chilled by the unconstitutional Charter provisions.

- And finally, Liberty Initiative Fund's claim for compensatory damages is dismissed, because the alleged damages are too speculative and attenuated from the City's alleged wrongful conduct.

The reasons are set out below.

## I.     Background

Under Houston's City Charter, circulators must submit a petition using a form that requires them to "attest by notarized signature that they are 'one of the [petition's] signers.'" *Pool v. City of Houston*, 978 F.3d 307, 309–10 (5th Cir. 2020) (quoting HOUSTON, TEX., CITY CHARTER, art. VII-a, § 3). The Charter requires that "[a]ll [petition] signers must be 'qualified voters of the City of Houston.'" *Id.* at 310. "To be a 'qualified voter,'" the signer must "reside in Houston and be registered to vote there." *Id.* at 310. Trent and Trey Pool—residents of Austin, Texas and California, respectively—neither reside nor are registered to vote in Houston. Under the Charter's terms, they cannot circulate petitions in Houston.

In June 2019, the Pools and Accelevate2020—Trent Pool's company that hires professional circulators—filed this lawsuit against the City of Houston and its Secretary, seeking a temporary restraining order and a preliminary injunction preventing the City from enforcing the relevant Charter provisions so that they could collect signatures for a proposed "anti-pay-to-play" ordinance that they hoped to place on the 2019 Houston City ballot. They also sought a permanent injunction and a declaratory judgment that the Charter is unconstitutional because the qualified-voter requirement for circulators violated their First and Fourteenth Amendment rights. (Docket Entry No. 7, at 3).

The defendants, referred to together as the "City," conceded that the voter-registration requirement was unconstitutional. (Docket Entry No. 15, at 13). The district court granted a

4

temporary injunction, allowing the Pools to circulate the "anti-pay-to-play" petition through the petition submission deadline of July 9, 2019, and enjoining the City of Houston and the Secretary from enforcing the qualified-voter requirements for "the petition to be circulated . . . by [the Pools], Accelevate2020, and any circulators they hire, and from rejecting signatures on the petition because the circulator has not signed the affidavit required by the City Charter attesting to residency and voter registration." (*Id.*, at 18).

The court order noted that "[u]nder the City of Houston Charter, signatures for an initiative or referendum must be collected within a period of thirty days." (*Id.*, at 9).  In August 2019, after the July 9, 2019, deadline to collect signatures had passed, the district judge then presiding over the case on its own dismissed the Pools' claims and closed the case, because "[a]t the [TRO] motion hearing, the parties agreed that Plaintiffs' claims would be moot at the expiration of the circulation period.  The petition circulation period expired on July 9, 2019." (Docket Entry No. 20).  In a motion for reconsideration, the Pools argued that the district judge erred in dismissing the case in its entirety, because they "continued to seek future relief, including a permanent injunction. . . .  But the court . . . concluded that there was no longer a live controversy." *Pool*, 978 at 312; (*see also* Docket Entries Nos. 26, 33).  The Pools and Accelevate2020 appealed the dismissal.

In the time between the district judge's dismissal and the appeal, the City took steps to "disavow" the Charter's qualified-voter requirements for petition circulators.  The City lacked the power to unilaterally amend its Charter to remove the offending provisions, because the Charter can be amended only by Houston voters through "a successful referendum."  Instead, the City inserted an "'Editor's note' below the offending Charter provisions, stating that 'the City will

accept petitions circulated by individuals that are not residents of the City or are not registered to vote in the City,' with a link to a revised form for nonresidents." *Id.* at 312. The City also created a separate form for nonresidents and nonregistered voters to use when circulating petitions in Houston, in addition to the form that was already available for resident voters.

During the appeal, the City argued that these efforts to disavow the Charter's residency and voter-registration requirements for circulators mooted the Pools' claim for permanent injunctive relief. The Fifth Circuit disagreed, reversing the district judge's judgment dismissing the case and remanding. The Fifth Circuit reached its decision by examining two "related but distinct justiciability doctrines: standing and mootness." *Id.* at 311.

First, the appellate court noted that the Pools (including Accelevate2020) had standing to bring claims for injunctive and declaratory relief because they had "shown a likelihood that they [would] continue to engage in the protected activity"—petition circulating in Houston—and there "[was] a sufficient threat" that the City would enforce the qualified-voter requirement against them and others when the Pools filed their lawsuit. *Id.* at 312. The court noted that two "features of this case render[ed] the Pools' concern about future enforcement reasonable." *Id.* "To begin," the court noted, "even though the Pools filed this case twenty years after *Buckley*"—the Supreme Court decision that "held unconstitutional a Colorado law providing that only registered voters could circulate petitions for ballot initiatives"—"the [Houston] petition form still obligated circulators to swear they are 'qualified voters of the City of Houston.'" *Id.* The court noted that although the City "counter[ed] that this requirement remained on the form because it [could] be changed only by amending the Charter, which itself requires a successful referendum," the City "d[id] not explain why [it had] failed to inform the public during the two decades following

6

*Buckley* that it would no longer enforce the qualified-voter provision even if it had to remain in the Charter." *Id.*

"Second," the appellate court continued, "there [was] an objective basis for believing that the City *ha[d]* attempted to enforce the unconstitutional Charter provision since *Buckley*. In 2014, the last time that an initiative or referendum petition made it onto the ballot, the City deposed petition organizers—including Trent Pool—about the validity of signatures they collected in view of the Charter's petition-form requirements." *Id.* at 312–13 (emphasis in original). As part of that deposition, "the City questioned Trent about whether he, as someone not eligible to vote in Houston, had 'sign[ed] any [affidavits] on petition pages' and had gathered signatures alone or 'arm in arm' with other circulators." *Id.* at 313 (alterations in original). "Why," the appellate court asked, "would Trent's proximity to circulators who were qualified Houston voters matter if the City were not concerned about that [Charter] requirement?" *Id.* "Given the concerns the City raised during the immediate predecessor to the anti-pay-to-play petition, the Pools had reason to believe the City would be 'seriously intent' on continuing to enforce the qualified-voter requirement." *Id.* (citation omitted). The court concluded that the Pools had standing to pursue their claims for injunctive and declaratory relief.

The appellate court then addressed whether the "City's postsuit disavowal of the qualified-voter requirement moot[ed] the Pools' claim." *Id.* The court determined that, based on the record, "the City's addition of the 'Editor's note' on its website [did] not moot [the] case," because "[v]oluntarily stopping an unconstitutional practice renders a case moot only 'if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior c[an] not reasonably be expected to recur.'" *Id.* at 314 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167,

189 (2000)).  The court noted that while it could "'assume that formally announced changes to official governmental policy are not mere litigation posturing,' it [was] not clear the City made a formal policy change."  *Id.* (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009)).  The court found a lack of evidence "that the City Council approved the nonresident petition form published on the City's website," so the court did "not know how permanent—or legally effective—the new form and Editor's note [were]."  *Id.*  Indeed, the court noted, "[t]he form itself indicate[d] that it was prepared by the City of Houston Legal Department—not an official policymaker—on September 17, 2019."  *Id.* at 314 n.9.  Absent evidence of a "permanent policy change," the City had not met its "'heavy burden' of showing that the Pools' challenges [were] moot."  *Id.* at 314 (quoting *Friends of the Earth*, 528 U.S. at 189).  The court instructed that on remand, "[i]n ruling on the request for a permanent injunction, the district court may consider whether to allow additional evidence concerning the legal authority behind the new form and the extent to which it is binding."  *Id.*  The Fifth Circuit remanded for further proceedings.  *Id.*

Following the appeal and remand, the City moved again to dismiss the Pools' amended complaint on mootness grounds.  The City noted that "[d]uring the pendency of this case, Houston ha[d] taken additional steps to provide additional evidence that it *still* really has no intention of attempting to enforce unenforceable charter provisions."  (Docket Entry No. 49, at 11 (emphasis in original)).  The City cited the "Editor's note" that had been added to the Charter beneath the unconstitutional Charter provision, and which also "appears on the City's website."  The Editor's note states:

> Editor's note—In light of court decisions addressing the constitutionality and enforceability of circulator requirements, the City will accept petitions circulated by individuals that are not residents of the City or are not registered to vote in the City, provided the circulators complete the City's alternate affidavit form.  In lieu

8

of the affidavit provided in Article VII-a, section 3 of the Charter, circulators who:
(a) are residents of the City of Houston but are not registered to vote in the City or
(b) are not residents of the City must use the "Non-Resident/Non-Registered
Circulator Affidavit," available in the City Secretary's Office and at the City
Secretary's Office Homepage here: http://www.houstontx.gov/citysec/.

(*Id.*, at 11–12).

In addition to the Editor's note, the Houston City Council passed Ordinance No. 2020-1033, which "approve[d] and incorporate[d] [the Editor's note] language as an acceptable substitute for that called for in the charter." (*Id.*, at 12). The Ordinance was signed by all City Council members and the Mayor of Houston on December 2, 2020. (*See* Docket Entry No. 49-1). The Ordinance states that the City of Houston now "accepts petitions circulated by individuals who are not registered to vote in the City." (Docket Entry No. 95, at 14). The City Council adopted the Ordinance because "the Fifth Circuit, in *Pool v. City of Houston*, . . . opined that absent Houston City Council action, it is not clear that the City has changed its policy and will comply with *Buckley*." (*Id.*, at 2). The Ordinance amended Article I of Chapter 2 of the Code of Ordinances, Houston, Texas, "by adding a new Section 2-3.1 that reads as follows":

### Sec. 2-3.1.    Petition circulator affidavits.

(a) It is the policy of the city to enforce the United States Constitutional requirements relating to petition circulator qualifications.

(b) The city shall accept the 'Affidavit for Circulators Who Are Not Registered Voters of the City of Houston,' in the form set forth below.

STATE OF TEXAS                    §

COUNTY OF HARRIS              §

I, _____, being first duly sworn on oath depose and say:

9

I am a circulator who is not registered to vote in the City of Houston.  I hereby subject myself to the jurisdiction of the Courts of Texas in connection with any allegation of fraud or misrepresentation associated with the circulation of any initiative, referendum, or recall petition or the collection of signatures for any initiative, referendum, or recall petition circulated in the City of Houston by me.  I am a citizen of the United States or a documented permanent resident; I have never been convicted of the crimes of fraud or misrepresentation; I agree to submit myself to the jurisdiction of the Harris County courts and waive any challenge to venue and personal jurisdiction in connection with the matters encompassed by this affidavit.  Should the need for me to personally appear in Houston arise, I agree to make myself available in person in Houston, at my own expense, within 72 hours of a request by the City of Houston concerning matters encompassed by this affidavit.  I further depose and say that each signature appearing on this petition was made in my presence on the day and date it purports to have been made, and I solemnly swear that the same is a genuine signature of the person whose name it purports to be.

(Docket Entry No. 49, at 3).

In response to the motion to dismiss, the Pools moved to reamend their complaint.  The district court granted the motion for leave to amend.  (Docket Entries Nos. 56, 59).  The second amended complaint added two new plaintiffs—Liberty Initiative Fund and Paul Jacob.  (Docket Entry No. 64).   Liberty Initiative Fund is a Virginia-headquartered "nonprofit 501(c)(4) organization actively engaged in supporting direct democracy action to prohibit non-citizen voting in the United States," and "is organizing and intends to support an initiative petition to amend the Houston Code of Ordinances to prohibit non-citizen voting in Houston for either the 2021 or 2022 Houston general election ballot." (*Id.*, at 10).  Paul Jacob, the president of Liberty Initiative Fund, "intends to assist in the collection of signatures to place a non-citizen voting initiative on the Houston 2021/2022 general election ballot to amend the Houston Code of Ordinances," even though he is a "resident and registered voter" of Virginia.  (*Id.*)

10

The amended complaint also added new claims.  The plaintiffs continued to seek "declaratory and, if necessary, injunctive relief prohibiting [the City] from enforcing" Houston Charter provisions that "impose a voter registration and residency requirement within the City of Houston to circulate initiative or referendum petitions to place a measure on the Houston ballot, in violation of rights guaranteed to Plaintiffs under the First and Fourteenth Amendments to the United States Constitution."  (*Id.*, at 1–2).

The plaintiffs also raised new challenges to the constitutionality of the City Council's Ordinance 2020-1033.

- The plaintiffs sought "declaratory and, if necessary, injunctive relief" prohibiting the City from enforcing the newly created "Affidavit for Circulators Who Are Not Registered Voters of the City of Houston" that was adopted by the Houston City Council on December, 2, 2020.  (*Id.*, at 2).  The plaintiffs alleged that the affidavit for nonregistered voters violates "the Due Process and Equal Protection Clauses of the Fourteenth Amendment . . . , the prohibition against *Ex Post Facto* laws in Article I, Section 10, Clause 1 of the United States Constitution," and the "unconstitutional conditions doctrine."  (*Id.*).

- The plaintiffs alleged that the City's adoption of the "Affidavit for Circulators Who Are Not Registered Voters of the City of Houston" violated Section 9.004 of the Texas Local Government Code, "because the City Council has no authority to amend the home rule charter with a mere ordinance."  (*Id.*).

- Liberty Initiative Fund requested $10,000 in compensatory damages that it claims it will suffer "upon a continuing delay in the proper resolution of Plaintiffs' rights."  (*Id.*).

- The plaintiffs sought nominal damages and attorneys' fees and costs.  (*Id.*, at 35).

In response, the City amended their motion to dismiss, or alternatively, asked that summary judgment be granted on the second amended petition.  (Docket Entry No. 65).  The City argued that the "Plaintiffs' claims seeking declaratory and injunctive relief on [the] challenged Houston charter provision are moot," and that "[m]ost plaintiffs lack standing to assert such claims"; that the nominal damages claim is moot and that the plaintiffs lack standing to assert a claim for

nominal damages; that the plaintiffs lack standing to challenge "Houston's substitute verification form" under Texas state law; and that, even if they had standing, the plaintiffs fail to state a viable claim challenging the substitute verification form.  (*Id.*, at 2; *see also* Docket Entry No. 68).  The plaintiffs responded, and the City replied.  (Docket Entries Nos. 76, 77).

The court stayed discovery pending ruling on the motion to dismiss, or for summary judgment.  (Docket Entries Nos. 82, 84).  Despite the discovery stay, and six months after the City filed the pending motion to dismiss, the plaintiffs moved for summary judgment on their claims challenging the constitutionality of the Charter provisions and the City Ordinance.  (Docket Entry No. 85).

At this point, the case was transferred to this court, which promptly held a hearing, giving the parties ample opportunity for oral argument on the motions.  The court now grants in part and denies in part the City's motion to dismiss, and grants in part and denies in part the plaintiffs' motion for summary judgment.  The reasons are set out below.

## II.    The Legal Standards

The City moves to dismiss the plaintiffs' second amended complaint under Rules 12(b)(1), 12(b)(6), and 12(c), or alternatively, Rule 56 as a motion for summary judgment.  A motion to dismiss is converted to a motion for summary judgment when "matters outside of the pleadings are presented to and not excluded by the court."  Fed. R. Civ. P. 12(d).  "If a district court converts the motion into one for summary judgment, Federal Rule of Civil Procedure 56 . . . controls the court's consideration of the motion's merits.  Conversion is more likely when the non-pleading materials are comprehensive and will enable a rational determination of a summary judgment motion."  *Luna v. Am. Nat'l Ins. Co.*, Case No. 21-cv-00064, 2021 WL 1911339, at *4 (W.D. Tex.

May 12, 2021).  "Ordinarily, summary judgment occurs during or after the close of the discovery period.  This is at least in part because Rule 56's notice requirement is intended to prevent the premature cut-off of discovery."  *Id.*  In this case, discovery has been stayed since October 2021.

The City attaches several exhibits to its motion to dismiss: a copy of the City of Houston, Texas, Ordinance No. 2020-1033, (Docket Entry No. 68-1); a copy of the City Charter with the addition of the Editor's note, (Docket Entry No. 68-2); hearing transcript excerpts from earlier proceedings in this case, (Docket Entry No. 68-4); and the Texas Voter Registration Application, (Docket Entry No. 68-6).  The court may take judicial notice of these documents without converting the motion into one for summary judgment.  A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "matters of which judicial notice may be taken under Federal Rule of Evidence 201."  *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).  "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *see also Scrushy v. Tucker*, Case No. 21-2309, 2021 WL 3667329, at *2 (S.D. Tex. Aug. 18, 2021).  The City Ordinance, City Charter, the voter-registration application, and hearing transcripts are all matters of public record.

Because the court can review the City's motion to dismiss and attached documents without converting its motion to dismiss into a motion for summary judgment, and because the parties have not yet completed discovery, the court reviews the City's motion under Rules 12(b)(1), 12(b)(6), and 12(c).  The court reviews the plaintiffs' motion for summary judgment under Rule 56.

13

A.       **The Legal Standards for the City's Motion to Dismiss**

i.       **Rule 12(b)(1)**

Under Rule 12(b)(1), "a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation marks omitted).  The plaintiff has the burden to establish subject matter jurisdiction. *Id.*  "Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986).

A court lacks power to decide a claim when a plaintiff lacks standing to bring the claim. Standing requires: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  As "the party invoking federal jurisdiction," the plaintiffs "bear[] the burden of establishing these elements." *Lujan*, 504 U.S. at 561.  They must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation," which means that "on a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of … standing." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133–13 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561).

14

A court also lacks power to decide a claim when the claim is moot. "Article III of the Constitution authorizes federal courts to decide only 'Cases' or 'Controversies.'" *Manzo-Hernandez v. Saucedo*, No. 21-40034, 2021 WL 5627068, at *3 (5th Cir. Nov. 30, 2021) (quoting U.S. CONST., Art. III, § 2). "The 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Id.* (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (quotation omitted)). "Mootness has two aspects: 'when the issues presented are no longer "live" or the parties lack a legally recognizable interest in the outcome.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015). "If a dispute has been resolved or if it has evanesced because of charged circumstances, including the passage of time, it is considered moot. With the designation of mootness comes the concomitant designation of non-justiciability." *Am. Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988) (citations omitted).

### ii.    Rule 12(b)(6)

Under Rule 12(b)(6), a federal court dismisses a complaint if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). In reviewing a Rule 12(b)(6) motion, the court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014). "A court reviewing a motion to dismiss under Rule 12(b)(6) may consider '(a) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.'" *DZ Jewelry, LLC v.*

15

*Certain Underwriters at Lloyds London*, No. H-20-3606, 2021 WL 1232778 (S.D. Tex. Mar. 12, 2021) (quoting *Inclusive Cmtys. Proj.*, 920 F.3d at 900).

To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).

### iii.    Rule 12(c)

A motion for judgment on the pleadings "brought pursuant to Federal Rule of Civil Procedure 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). The Rule 12(c) standard is the same as that under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010).

### B.    The Legal Standard for the Plaintiffs' Motion for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

*Shepherd ex rel. Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence" which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial.'"  *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case.  *Austin v. Kroger Tex., LP*, 865 F.3d 326, 335 (5th Cir. 2017).  "If the moving party fails to meet [its] initial burden, [the summary judgment motion] must be denied, regardless of the nonmovant's response."  *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Willis v. Cleco*

*Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).   "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019).   In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor."  *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). When the facts are disputed, the court "need only decide whether those undisputed facts are material and entitle the movant to judgment as a matter of law."  *Flowers v. Deutsche Bank Nat. Tr. Co.*, 614 F. App'x 214, 215 (5th Cir. 2015).

## III.    Analysis

### A.    Injunctive and Declaratory Relief

The plaintiffs request preliminary and permanent injunctive relief prohibiting the City from enforcing the Charter provisions that "restrict the circulation of initiative and referendum petitions to registered voters of the City of Houston."  (Docket Entry No. 64, at 4, 26).  The plaintiffs also seek a declaratory judgment "that the challenged provisions are unconstitutional" because they "impose a severe restraint on Plaintiffs' rights guaranteed under the First and Fourteenth Amendments to the United States Constitution."  (*Id.*, at 27, 28–29).  The City argues that the court should dismiss the plaintiffs' claims for declaratory and injunctive relief, because these claims are

moot.  Because mootness would bar consideration of the plaintiffs' requests for injunctive and declaratory relief, the court addresses the issue of mootness first.

### i.    Mootness

In *Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020), the Fifth Circuit reversed and remanded the district court's judgment dismissing the Pools' claim for injunctive and declaratory relief.  On appeal, the City had argued that the Pools' challenges were moot.  At the time of the appeal, the City had added an "Editor's note" to its website and "below the offending Charter provisions.  The Editor's note stated that 'the City will accept petitions circulated by individuals that are not residents of the City or are not registered to vote in the City,' with a link to a revised form for nonresidents."  *Id.* at 312.  The City had created an "Affidavit for Circulators Who Are Not Registered Voters of the City of Houston," a form that petitioners who were not registered to vote in Houston could use when circulating petitions.  The Fifth Circuit held that these changes were insufficient to moot the plaintiffs' constitutional challenges to the relevant Houston Charter provisions.  The appellate court wrote:

> At least based on the current record, the City's addition of the "Editor's note" on its website does not moot this case.  Voluntarily stopping an unconstitutional practice renders a case moot only "if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior c[an] not reasonably be expected to recur."  While we "assume that formally announced changes to official governmental policy are not mere litigation posturing," it is not clear the City made a formal policy change.  There is no evidence that the City Council approved the nonresident petition form published on the City's website, so we do not know how permanent— or legally effective—the new form and editor's note are.

*Id.* at 314.

The appellate court noted that "[t]he form itself indicates that it was prepared by the City of Houston Legal Department—not an official policymaker—on September 17, 2019."  *Id.* at 314

n.9.  The court stated that, on remand, "the district court can consider whether to allow additional evidence concerning the legal authority behind the new form and the extent to which it is binding." *Id.* at 314.

After the appeal, the City Council approved the nonresident petition form by passing Ordinance No. 2020-1033 on December 2, 2020.  (Docket Entry No. 68-1).  The Ordinance, which was passed unanimously by Council members and signed by the Mayor, approved the "Affidavit for Circulators Who Are Not Registered Voters of the City of Houston" and made clear that "[i]t is the policy of the city to enforce the United States Constitutional requirements relating to petition circulator qualifications."  (*Id.*, at 3).

The City Council passed the Ordinance, but it could not unilaterally amend the City Charter to remove the allegedly unconstitutional requirements for petition circulators.  To amend the Charter, a majority of the City Council must first vote to submit the repeal of a charter provision to voters, and a majority of voters must then vote to repeal that Charter provision.  (Docket Entry No. 95, at 9).  The City Council did not submit the repeal of the challenged Charter provision to voters.  Instead, the City Council enacted Ordinance No. 2020-1033, which stated that the City of Houston would now "accept[] petitions circulated by individuals who are not registered to vote in the City."  (*Id.*, at 14).  The City argues that this case is now moot, because the Ordinance, the Editor's note, and the nonresident and nonvoter petition form, are enough to satisfy the Fifth Circuit's concern on appeal that there was "no evidence that the City Council approved the

nonresident petition form published on the City's website." *Pool*, 978 F.3d at 314.  According to the City, it is now clear that the City Council approved the form, and this case is moot.

The plaintiffs disagree that the passage of the Ordinance moots this case.  When the Fifth Circuit remanded in *Pool*, it instructed this court to consider "the legal authority behind the new form and the extent to which it is binding." *Id.*  The plaintiffs argue that, despite the City Council's enactment of the Ordinance, there still is no "legal authority behind the new form," and so it is not "binding."  The plaintiffs argue that the City Council's official stamp of approval for the nonresident and nonvoter petition form does not provide reasonable assurance that the City of Houston will not enforce the City Charter's terms against them in the future.  The cited reasons are that: (1) "[a]n *ordinance* contrary to a home rule charter cannot moot Plaintiffs' facial claim against a *charter* provision;" (2) the Ordinance could be "repealed just as easily as it was enacted;" and (3) the court can still provide relief by issuing a declaratory judgment that the Charter requirement is unconstitutional, even if injunctive relief is inappropriate.  (Docket Entry No. 76, at 10–15 (emphasis in original)).

Both sides agree that an ordinance cannot amend or repeal a Charter provision. *See Carruth v. Henderson*, 606 S.W.3d 917, 927 (Tex. App. 2020) ("A city's Charter functions as its organic law in the same nature as a constitution and . . . is therefore not capable of being repudiated by ordinance."); *cf. Wilgus v. City of Murfreesboro*, 532 S.W.2d 50, 52 (Tenn. App. 1975) ("It is an elementary principle that ordinances of a city are subordinate to charter provisions.  The city may not by ordinance nullify a mandatory provision of its charter.").  An ordinance that conflicts with the Charter is void. *See* HOUSTON, TEX., CITY CHARTER, art. IX, § 7 ("All ordinances of the City of Houston, *not inconsistent with the provisions of this Charter*, shall remain in full force and

effect" (emphasis added)); *see also* CONFORMITY TO CHARTER, 5 MCQUILLIN MUN. CORP. § 15:17 (3d ed.) ("Ordinances must not only conform with the express terms of the charter, allow[ing] otherwise would permit the municipality to amend the charter without subjecting the amendment to the scrutiny accorded a charter amendment.  Consequently, an ordinance violative or not in compliance with the city charter is void.").

The Houston Charter requires that a petition circulator be a qualified voter.  Ordinance 2020-1033 says that a petition circulator does not need to be a qualified voter.  The Ordinance is "inconsistent with the provisions of [the] Charter," and is likely void.

The City argues, however, that the Ordinance does not "amend or repeal" the Charter. Instead, the City argues that when the Supreme Court decided *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999), the challenged Houston Charter provisions became "void *ab initio*, having no effect, as though [they] had never been passed," because the provisions were unconstitutional.  (Docket Entry No. 95 (quoting *Alexander v. Cockrell*, 294 F.3d 626, 630 (5th Cir. 2020)).  Because the Charter provisions were void after *Buckley*, the Ordinance did not "conflict with" the Charter, the City was empowered to enact the Ordinance, and the Ordinance was a "valid, binding law and the form policy change [that] the Fifth Circuit required to show mootness here."  (Docket Entry No. 97, at 7).

The plaintiffs disagree.  The plaintiffs assert that "[t]he City Council does not have the authority to legislate around a Charter provision in the absence of a judicial order declaring this specific Charter provision unconstitutional or otherwise unenforceable," and that the Supreme

Court's decision in *Buckley* did not render Houston's Charter provision "void *ab initio*," as the City argues.  (*Id.*).

The City's argument for the validity and enforceability of the Ordinance is that the Supreme Court's *Buckley* decision voided the offending Houston Charter provisions.  *Buckley* does not appear to go so far.  In *Buckley*, the plaintiffs challenged a Colorado law that required petition circulators to be registered voters, Colorado residents, and to wear an identification badge with the circulator's name.  The law also required "proponents of an initiative [to] report the names and addresses of all paid circulators and the amount paid to each circulator."  525 U.S. at 186.  The Supreme Court held that requiring Colorado petitioners to be registered voters violated the First and Fourteenth Amendments, because it "impose[d] a burden on political expression that the State . . . failed to justify."  *Id.* at 195 (quoting *Meyer v. Grant*, 486 U.S. 414, 428 (1988)).

In examining the registered-voter requirement, the *Buckley* Court weighed the "burden on political expression" from the registered-voter requirement against Colorado's stated interest in requiring circulators to be registered voters.  The Court noted that "[w]hen the case was before the District Court, registered voters in Colorado numbered approximately 1.9 million," and "[a]t least 400,000 persons eligible to vote were not registered."  *Id.* at 193.  Testimony at trial revealed that "large numbers" of circulators were "not registered voters."  *Id.* at 194.  "[T]he District Court found from the statistical and testimonial evidence" that "the requirement of registration limit[ed] the number of persons available to circulate and sign [initiative] petitions and, accordingly, restrict[ed] core political speech."  *Id.* (citation omitted).  Colorado argued that the registered-voter

requirement did not "severely" limit speech, because "it is exceptionally easy to register to vote." *Id.* at 195.

The Supreme Court disagreed, noting that some of the plaintiffs had testified that they did not want to register to vote, no matter how easy. "For these voter-eligible circulators," the Court wrote, "the ease of registration misses the point." *Id.* at 196. Colorado also argued that it had an interest in "ensur[ing] that circulators [would] be amenable to the Secretary of State's subpoena power, which in these matters does not extend beyond the State's border." *Id.* The Court noted, however, that the State's interest in ensuring that its subpoena power reached petition circulators was served by the requirement "that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides, including the street name and number, the city or town, [and] the county.'" *Id.* (citation omitted). In sum, Colorado did not show sufficient need for a voter-registration requirement, and the plaintiffs showed that the registration requirement greatly burdened "political speech." *Id.* at 197; *see also id.* at 211 (Thomas, *J.*, concurring) ("A large number of Colorado's residents are not registered voters, as the majority points out, and the State's asserted interest could be more precisely achieved through a residency requirement."). The Court held that Colorado's voter-registration requirement for circulators was unconstitutional.

*Buckley* did not hold that voter-registration requirements for petition circulators are *always* unconstitutional. Rather, *Buckley* was based on a fact-specific record developed at trial that examined the state's asserted interests and the burdens the voter-registration requirement imposed on the plaintiffs and other circulators. The Court examined the factual record and determined that

24

Colorado's registered-voter requirement was unconstitutional. *Buckley* did not hold that the City of Houston's Charter provisions were unconstitutional.

Since *Buckley*, many courts have been asked to examine challenges to local laws that require petitioner circulators to be registered voters or residents. Those courts have not held that *Buckley* automatically invalidated such laws. Instead, courts "have carefully examined any challenged residency and registration requirements [for circulators], and have divided as to their constitutionality." *Nadar v. Blackwell*, 545 F.3d 459, 477 (6th Cir. 2008).

In these cases, the courts have closely analyzed "the particular facts of the case" to determine whether the provisions were unconstitutional. *See id.*; *see also Krislov v. Rednour*, 226 F.3d 851, 861 (7th Cir. 2000) ("[I]n *Buckley* . . . the Court held that a Colorado law placed a formidable burden on First Amendment rights because it permitted only registered voters of Colorado to circulate initiative petitions for ballot access. Accordingly, while an analysis of the burden a law places on First Amendment rights is situation-specific, the similarly between these cases and the present one strongly suggests that the Illinois statute several burdens the candidates' rights."); *Wilmoth v. Sec'y of N.J.*, 731 F. App'x 97, 104–05 (3d Cir. 2018) (remanding on the question of whether a "New Jersey law prohibiting registered, out-of-state voters from circulating nomination petitions" "violate[d] the Appellants' constitutional rights," "to allow the parties to develop an appropriate factual record . . . upon which to determine" whether the law was "narrowly tailored to protect the State's interest."); *Jones v. Sec'y of State*, 238 A.3d 982, 991 (Me. 2020) ("Unlike in *Buckley* . . . there has been no trial or summary judgment motion to generate evidence for the trial court's . . . consideration here. . . . Such a record is vital, as the briefs of the parties demonstrate, with both the Secretary of State and Jones citing information from various sources

concerning voter registration statistics and patterns and speculating about voter behavior given Maine's registration procedures.").

While the similarity between the Houston Charter provisions and the Colorado law at issue in *Buckley* means that the Houston Charter provision are likely unconstitutional, the *Buckley* decision did not make the Houston Charter provision "void *ab initio*," because the *Buckley* Court did not hold that Houston's Charter provisions were unconstitutional. The City's argument that "the challenged charter provisions became invalid and unenforceable when the *Buckley* opinion was issued," giving the City Council the power to enact an ordinance despite a Charter provision that conflicted, is incorrect. (Docket Entry No. 95, at 2). The challenged Charter provisions did not become "invalid and unenforceable when the *Buckley* opinion was issued." The provisions were clearly subject to challenges that, under *Buckley*, required a factual basis to resolve. No such record or resolution has occurred here. The Charter provisions are still effective and in the Charter. The City has not provided this court with local or state authority, or case law, that grants a City Council the power to enact an ordinance that conflicts with an existing Charter provision, absent a court ruling that the Charter provision is unconstitutional, not that it might be unconstitutional.

Recognizing this issue, the City advanced two different arguments for mootness in the hearing before this court. First, the City argued that that the Charter contains clauses that permit the City to sever provisions that it believes are unconstitutional—which would then enable them to enact an Ordinance. When pressed, however, the City conceded that there was no specific provision in the Charter that would sever the qualified-voter requirements for circulators. (*See* Docket Entry No. 99, at 1 ("[T]his Court inquired as to whether there is a severance/savings clause that expressly applies to the challenged charter provisions. There is not one.")). But, the City

argued, the court should presume that unconstitutional charter provisions are severable, even if a severance clause is not in the Charter. (*See id.*, at 2). In support, the City filed supplemental briefs citing cases that hold that unconstitutional provisions in *statutes* are severable. (*See id.*). But this is a charter, not a statute. And the City has provided no persuasive argument for why the court should presume that parts of a charter—which "functions as [a City's] organic law in the same nature as a constitution"—can be severed in the same way that a legislative statute can. *Carruth*, 606 S.W.3d at 927.

The City also argued that, even if the Ordinance cannot repeal or amend the Charter, the Ordinance functions as a formal announcement that the City has no intention of enforcing the challenged Charter provisions, and that this announcement—regardless of whether the Ordnance is void or not—is sufficient to moot the case. In the hearing, the City argued:

> So the Fifth Circuit . . . said, that if we want to have this case declared moot, and have it go away, we had to do something more than we had done, which was an editor's note. So it said we had to have a formally announced policy change, not a formal policy change, which we can't do without the voters. But a formally announced policy change recognizing *Buckley*'s effect on the petition circulator process here. And we did that—with . . . Ordinance 2020-1033 which formally announced the policy change after *Buckley* stating that we were revising the form and providing the form.

The City's argument is unpersuasive. The *Pool* court remanded on the issue of mootness, stating, "[w]hile we 'assume that formally announced changes to official governmental policy are not mere litigation posturing,' it is not clear the City made a formal policy change. . . . [W]e do not know how permanent—or legally effective—the new form and [E]ditor's note are." 978 F.3d at 314 (quoting *Sossamon*, 560 F.3d at 325). The court continued: "[i]n ruling on the request for

27

a permanent injunction, the district court may consider whether to allow additional evidence concerning the legal authority behind the new form and the extent to which it is binding." *Id.*

The *Pool* court made clear that it was not enough for mootness that the City announce an intention to stop enforcing the Charter provisions by adding an Editor's note on its website and creating a nonresident petition form.  Instead, the City needed evidence that the announcement has permanent legal effectiveness.  The City has not provided or pointed to allegations or evidence that the Ordinance—which was enacted by the City Council, but which conflicts with the unrepealed Charter provisions—is legally effective.

The lack of a valid ordinance raises the same concerns that foreclosed finding mootness on appeal: "it is not clear the City made a formal policy change."  *Id.*; *cf. Church of Our Lord and Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 679–80 (7th Cir. 2019) (the district court held that city ordinances mooted the plaintiff's legal claims, but the court of appeals disagreed, in part, because "the ordinances [were] ineffective.").  Absent sufficient allegations and evidence or case law that the City's current measures are valid in spite of the conflicting Charter provisions, and permanent, it is not "absolutely clear" that the City will not enforce the Charter provisions in the future.  *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020) ("A defendant claiming that is voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could no reasonably be expected to recur." (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).  This case is not moot.

Two final point on mootness.  The City argues that if this case is not mooted by the City's actions, then the City will always be forced to litigate the constitutionality of a challenged Charter provision, even when the City concedes that the provision is unconstitutional and that it has no

28

intent to enforce it.  The City argues that it takes a broad view of Supreme Court cases, including *Buckley*, and does not enforce Charter provisions or laws that it believes are unconstitutional.  The City does not believe that it should always have to first litigate and get a court ruling on the constitutionality of a Charter provision in order to make the challenge moot.

Nothing in this opinion prevents the City from electing to not enforce a Charter provision that it believes is unconstitutional.  The court commends the City for taking proactive steps to avoid enforcing Charter provisions that are clearly subject to constitutional attack, even when the relevant Supreme Court case did not specifically say so.  Proactively stopping enforcement of an unconstitutional Charter provision will usually prevent this sort of litigation.  In most cases, a plaintiff will lack standing to challenge a law that the City has refused to enforce for an extended period.  As the Fifth Circuit stated in *Pool*, standing "[is] where most attempts to challenge a zombie law"—a law that remains on the books but has long been unenforced—"would fail."  978 F.3d at 312.  "Without any indication that the government is planning to enforce a law after a similar one has been held unconstitutional in a binding decision, there would be no objective fear of continued enforcement."  *Id.*  This case is unusual because the Fifth Circuit held that the plaintiffs *did* have standing.  The Fifth Circuit determined that the Pools plausibly alleged that the City was "planning to enforce" the "qualified voter" Charter provisions even "after a similar one ha[d] been held unconstitutional" in *Buckley*.

The second unusual feature of this case is that it involves the City's Charter.  In support of its mootness arguments, the City cited to cases involving unconstitutional statutes or ordinances.  "[A] case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed."  *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020).

A Charter does not "expire" and cannot be "repealed" without support from the voters.  As a result, mooting a constitutional challenge to a Charter provision may indeed be more difficult than mooting a challenge to a statute or ordinance.  The City could have—in the 20 years since *Buckley* was decided—voted to submit the repeal of the challenged Charter provisions to voters.  *See* TEX. LOC. GOV'T CODE § 9.004(a).  While the City argues that it should not be required to "expend considerable city resources" to remove a Charter provision that it believes to be unconstitutional, the City is governed by a home-rule charter.  (Docket Entry No. 95, at 10).  A consequence of charter rule is that a city may have to expend resources to remove provisions that it believes may violate the Constitution, in the absence of a court ruling so clearly holding.  The City Council did not do so here.

This case is not moot.  The court considers the plaintiffs' claims for injunctive and declaratory relief.

### ii.      The Necessity of Injunctive Relief

"A party seeking a permanent injunction must 'establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 576 (5th Cir. 2021). A party seeking a preliminary injunction must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs harm that will result if the injunction is granted; and (4) that granting the injunction will not disserve the public interest.  *Id.*  "Generally speaking, the standard for determining whether a permanent versus a preliminary injunction should

issue is primarily the same, except that, in the former, the court determines the plaintiff's success on the merits rather than the plaintiff's likelihood of success on the merits." *Jabr v. Rapides Par. Sch. Bd. ex rel. Metoyer*, 171 F. Supp. 2d 653, 666 (W.D. La. 2001).

The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a federal court to issue declaratory relief "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). The court may issue a declaratory judgment when "the facts alleged, under the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "[A] court may find that a declaratory judgment was and remains justified, but that an injunction is not necessary or appropriate because the government has represented that it will obey the law as declared by the court in the future." *Calderon Jimenez v. Nielsen*, 399 F. Supp. 3d 1, 2 (D. Mass. 2018).

The plaintiffs have demonstrated success on the merits: the disputed Charter provisions are unconstitutional because they substantially burden First Amendment rights by limiting the pool of potential petition circulators to qualified voters. In *Buckley*, the Supreme Court struck down a Colorado statute requiring petition circulators to be registered voters in Colorado. The Court observed that the registered-voter requirement "decrease[d] the pool of potential circulators," rejected Colorado's assertion that the registered-voter requirement was not a severe burden because it was not difficult to register to vote, and determined that Colorado had failed to justify

the burden on political speech.  525 U.S. at 186.  The Court held that Colorado's registered-voter requirement for petition circulators violated the First Amendment.  *Id.* at 197.

*Buckley* was decided after a trial on the merits that provided the factual record necessary to demonstrate the burden that the registered-voter requirement had on limiting political speech. Here, there is no similar factual record.  But courts have "easily determine[d]" that voter registration requirements "impose[] a severe burden" on First Amendment rights.  *We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 50 (D. Me. 2021); *cf. Nader*, 545 F.3d at 475–76 (enforcement of a voter-registration requirement against circulators violated the First Amendment even though "the records and briefs [did] not contain the usual evidence and arguments about whether Ohio's law [was] narrowly tailored to achieve a compelling interest," because it was undisputed that the requirement "curtailed . . . core political speech").

If the Colorado voter-registration requirement at issue in *Buckley* imposed a severe burden without a compelling interest, then Houston's qualified-voter requirement—which requires circulators to be both registered to vote *and* residents of Houston—imposes a severe burden on the plaintiffs without a compelling interest in doing so.  *See Buckley*, 525 U.S. at 197 ("[T]he requirement cuts down the number of message carriers in the ballot-access arena without impelling cause.").  The City has conceded that its interest in the qualified-voter requirement is to "ensur[e] election integrity."  This interest did not overcome the burden on First Amendment rights in *Buckley*, and it similarly does not overcome the burden here.  For this reason, the City has repeatedly agreed with the plaintiffs that the qualified-voter requirement is unconstitutional.  (*See, e.g.*, Docket Entry No. 95, at 1; *see also* Jan. 25, 2022, Hearing Tr. (Court: "[Does] the qualified-

32

voter requirement accomplish[] [the City's interest in ensuring election integrity] in a constitutional fashion?"  The City: "[N]ot the current one in the charter.")).

The Charter's unconstitutionality does not, however, require an injunction, because the plaintiffs have not demonstrated that there is a "substantial threat of irreparable injury if an injunction is not issued."  The plaintiffs allege that they want to circulate petitions in Houston, but they have not specified the deadlines by which they want, or need to, circulate those petitions.  The City of Houston and the Houston City Council have made clear from the beginning of this lawsuit that they have no desire to enforce the Charter provisions that they agree are unconstitutional. (*See, e.g.*, Jan. 25, 2022, Hearing Tr. (The City: "We have issued as clearly as possible a controlling statement by our city council, legislative branch of our government, that our intention is not to enforce what is in—in the charter because it's unconstitutional[].]").  The City Council passed Ordinance 2020-1033 less than six weeks after the Fifth Circuit's decision in *Pool*, which "opined that absent Houston City Council action, it [was] no clear that the City ha[d] changed its policy and [would] comply with *Buckley*."  (Docket Entry No. 95, at 14).  The Ordinance adopted a form for nonregistered voters and disavowed the City Charter's qualified-voter requirement.

This court has serious doubts about the validity of the Ordinance in light of the continued existence of the inconsistent Charter provisions when the Charter has not been declared unconstitutional.  This precludes a finding of mootness on this record.  The City has argued, and case law supports, that after the court declares the Charter provisions unconstitutional, then the City Council may enact an ordinance that addresses requirements for petition circulators.  The City Council's rapid decision to enact an Ordinance after the Fifth Circuit's decision in *Pool* suggests that the City will do so again after a decision by this court.  "The Supreme Court has indicated that

district courts should use caution in issuing injunctive orders against government officials and that it may be appropriate to give those officials an opportunity to rectify violations of law before issuing an injunction." *Calderon Jimenez*, 399 F. Supp. 3d at 2 (citing *Farmer v. Brennan*, 511 U.S. 825, 846–47 (1994)).

The court exercises this caution here. Instead of issuing an injunction, the court finds that declaratory relief is appropriate and holds that the Houston Charter unconstitutionally "imposes a burden on political expression" protected by the First Amendment "that the [City] has failed to justify," by limiting petition circulators to only qualified voters. *Buckley*, 525 U.S. at 195 (quoting *Meyer*, 486 U.S. at 428).[1]

The court dismisses the plaintiffs' claims for injunctive relief and grants the claim for a declaratory judgment.

## B.      The Challenges to Ordinance 2020-1033

Ordinance 2020-1033, enacted to remedy the Charter's unconstitutional qualified-voter requirement, states: "[T]he City of Houston accepts petitions circulated by individuals who are not registered to vote in the City, provided the circulators complete the 'Affidavit for Circulators Who

---

[1] To be clear, this holding does not reach the issue of whether a Houston *residency* requirement for petition circulators would be constitutional, because that issue is beyond the scope of this litigation. The Houston Charter requires that a petition circulator be a qualified voter, meaning that the circulator must be both a resident and a registered voter. The court holds that the qualified-voter requirement is unconstitutional, because the City has not demonstrated the necessity of requiring a combined residency and voter-registration requirement. The City does not concede, and this court need not decide, whether a residency requirement alone would violate the First Amendment. The *Buckley* Court did not reach this issue. The Court "assum[ed] that a residency requirement would be upheld as a needful integrity-policing measure" but had "no occasion to decide because the parties [did] not place[] the matter of residence at issue." 525 U.S. at 197. A decision that a residency requirement would violate the plaintiffs' First Amendment rights would be "an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). The court may not issue declaratory relief on an issue that is merely "hypothetical."

Are Not Registered Voters of the City of Houston.'"  (Docket Entry No. 95, at 14).  The Affidavit

for nonregistered voters allows an individual "who is not registered to vote in the [C]ity of

Houston" to circulate petitions in Houston, provided that he or she: (1) agrees to "subject [himself

or herself] to the jurisdiction of the Courts of Texas in connection with any allegation of fraud or

misrepresentation associated with the circulation of any initiative, referendum, or recall petition or

the collection of signatures for any initiative . . . in the City of Houston;" (2) represents that he or

she has "never been convicted of the crimes of fraud or misrepresentation;" and (3) agrees to "make

[himself or herself] available in person in Houston, at [his or her] own expense, within 72 hours

of a request by the City of Houston concerning matters encompassed by [the] affidavit."  (*Id.*, at

15).

      The plaintiffs move for summary judgment on claims seeking an injunction and declaration

that Ordinance No. 2020-1033 violates their First and Fourteenth Amendment rights.  The

plaintiffs argue that the City's approval of the "Non-Resident/Non-Registered Circulator

Affidavit" "independently violates rights guaranteed to Plaintiffs under the First and Fourteenth

Amendments to the United States Constitution, the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution, [and] the prohibition against *Ex Post Facto* laws

guaranteed under Article I, Section 10, Clause 1 of the United States Constitution."  The plaintiffs

take issue with two parts of the Affidavit: (1) the requirement that circulators swear that they "have

never been convicted of the crimes of fraud or misrepresentation"; and (2) the requirement that

"should the need for [the circulator] to personally appear in Houston arise," the circulator must

"agree to make [himself or herself] available in person in Houston, at [his or her] own expense,

within 72 hours of a request by the City of Houston concerning matters encompassed by this affidavit."

The plaintiffs also assert that the City Council's approval of the "Affidavit for Circulators Who Are Not Registered Voters of the City of Houston" violated Section 9.004 of the Texas Local Government Code, "because the City Council has no authority to amend the home rule charter with a mere ordinance." (*Id.*).  Section 9.004 of the Texas Local Government Code provides that:

> The governing body of a municipality on its own motion may submit a proposed charter amendment to the municipality's qualified voters for their approval at an election.  The governing body shall submit a proposed charter amendment to the voters for their approval at an election if the submission is supported by a petition signed by a number of qualified voters of the municipality equal to at least five percent of the number of qualified voters of the municipality or 20,000, whichever number is smaller.

Tex. Local Gov't Code § 9.004.

For the reasons explained at length, the court finds that Ordinance 2020-1033 was likely not a valid exercise of the City Council's authority.  But the court also finds that the plaintiffs lack standing to raise their state-law claim.  "Standing requirements weed out those lawsuits where the plaintiff's interests and the injuries are not particularized and distinct from those of the general public."  *Walton v. City of Midland*, 287 S.W.3d 97, 100 (Tex. App. 2009) (citing *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001)).  "No Texas court has ever recognized that a plaintiff's status as a voter, without more, confers standing to challenge the lawfulness of governmental acts."  *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001).  If Harris County voters lack standing to challenge the lawfulness of the City Council's acts, then the plaintiffs—who are not Harris County voters and are not represented by the City Council—do not have standing to challenge the lawfulness of the City Council's acts.  If the City Council has acted beyond the scope of its powers

in enacting Ordinance 2020-1033, the resulting harm is to the general public, and specifically to Houston residents and voters, not to the plaintiffs. The state-law claim is dismissed for lack of standing. *See id.* ("Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large.").

This leaves a host of claims challenging the 72-hour requirement and the requirement that circulators swear that they have not been convicted of fraud. The City argues that these requirements were initially fashioned by the district judge in granting the plaintiffs' requested temporary restraining order; that the plaintiffs agreed to the requirements; and that the plaintiffs are estopped from challenging the requirements now. (Docket Entry No. 88, at 16). The City also argues that it has a compelling interest in the 72-hour notice requirement because nonresident circulators "reside outside the range of the Harris County courts' subpoena power," and "there is nothing in the [Ordinance] that prevents Plaintiffs from seeking or obtaining an accommodation [to the 72 hour appearance requirement] should the need arise." (*Id.*, at 18).

There is a difference between agreeing to abide by certain requirements for a temporary order that applied to a single petition cycle and agreeing to those requirements as a permanent solution to the Charter's unconstitutional qualified-voter provisions. The plaintiffs are not estopped from challenging those requirements now. Moreover, the Affidavit for nonregistered voters already contains a provision that protects against the fact that some circulators may "reside outside the range of Harris County courts' subpoena power." The Affidavit requires a petition circulator to "agree to submit [him]self to the jurisdiction of the Harris County courts and waive any challenge to venue and personal jurisdiction in connection with the matters encompassed by this affidavit." (Docket Entry No. 88-1, at 3). The City has not explained why a circulator must

also swear that he or she will "make [himself or herself] available in person in Houston, at [his or her] own expense, within 72 hours of a request by the City of Houston concerning matters encompassed by this affidavit." (*Id.*).

There are also issues with the plaintiffs' arguments, including about standing. At the motion hearing, the plaintiffs seemed primarily concerned with the Ordinance's 72-hour requirement and the First Amendment implications of that requirement, and not the kitchen sink of other claims that they raised in their amended complaint, including arguments that the Ordinance violates the guarantee against *ex post facto* laws under Article I, Section 10, Clause 1 of the United States Constitution and the "constitutional conditions doctrine."

The court does not decide now whether the contested Ordinance requirements are constitutional. Having obtained a declaratory judgment that the Charter provisions that limit petition circulators to qualified voters are unconstitutional, the City may now enact a new Ordinance with different requirements or reenact the same Ordinance with the same requirements. For example, in *Duncantell v. City of Houston*, 333 F. Supp. 973 (S.D. Tex. 1971), the court held that Article V, Section 6, of the Houston City Charter—which required all candidates filing to run for mayor to pay a fee of $1,250—was unconstitutional because the Charter did not provide any nonmonetary alternative to the fee. *Id.* at 927–28. The City of Houston then enacted an ordinance providing that, as an alternative to paying the mayoral-race filing fee, a mayoral candidate could submit a petition signed by a specified number of qualified voters. In *Nelson v. Welch*, 499 S.W.2d 927 (Tex. Civ. 1973), the plaintiffs argued that the City Ordinance was invalid because the City Council could not amend the charter through an ordinance. *Id.* at 928. The court disagreed, stating that once the charter provision was declared unconstitutional, it was void, and the city could enact

an ordinance, because the Houston City Charter provides that "in all matters not covered by this Charter or by the general law of the State of Texas, the City Council shall by ordinance make provisions relating to the holding of the City General Election and all matters relating hereto." *Id.* (quoting HOUSTON, TEX., CITY CHARTER, art. V, § 7).  Notably, the unconstitutional provision, Article V § 6, remains in the Houston Charter even today.  *See* HOUSTON, TEX., CITY CHARTER, art. V, § 6 ("Each candidate for Mayor shall pay a filing fee of $1,250.00.").  But that unconstitutional Charter provision is void and unenforceable to the extent that it requires all mayoral candidates to pay a mandatory fee.  An ordinance now governs.

This court's declaratory judgment gives the City an opportunity to enact an ordinance.  The City created its Affidavit for nonregistered voters based on the court order, issued before the appeal, granting temporary relief to the plaintiffs.  But what may have been appropriate in a temporary order may not be so as a permanent solution.  The court takes no position on whether the provisions in Ordinance No. 2020-1033 are constitutional as currently drafted, but gives the City an opportunity to amend and reenact the Ordinance if it so wishes.

To facilitate this process, the court orders the City to advise the court by **April 18, 2022**, if it plans to reenact or prepare a new ordinance in light of this opinion.  The City does not need to enact a new ordinance in that time period, but must file a letter advising the court and the plaintiffs if it plans to promptly reenact or supersede the existing Ordinance with a new one.  If and when the City enacts a new ordinance—whether it contains the same or different requirements for petition circulators as Ordinance No. 2020-1033—the plaintiffs may amend their complaint within

21 days of the passage of the new ordinance, to raise any challenges to any new ordinance passed by the Houston City Council, if any.

### C.      Nominal Damages

In addition to declaratory and injunctive relief, the plaintiffs argue that they are entitled to nominal damages for past chilled speech allegedly caused by the unconstitutional Charter provisions.[2]  (Docket Entry No. 64, at 35; Docket Entry No. 76, at 26).  "[P]laintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury."  *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1014 (5th Cir. 2003).  In *Pool*, the Fifth Circuit did "not address whether their request for nominal damages would alone be enough to keep the case alive," because it held "that the Pools have standing to pursue their claims for declaratory and injunctive relief."  978 F.3d at 314 n.10.  The court noted, however, that "[i]t is far from clear that the Pools have such a claim for [nominal] damages when the law was not actually enforced against them in 2019.  They instead brought this case to prevent their speech from being chilled."  *Id.*  The City has moved to dismiss, arguing that the plaintiffs lack standing because nominal damages will not "redress" their alleged chilled speech.  (Docket Entry No. 68, at 24–25).

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'  For there to be a case or controversy under Article III, the plaintiff must have a

---

[2] The plaintiffs argue only that their speech was chilled because of fear that the City would enforce the unconstitutional Charter provisions against them, not because of fear that the City would enforce the requirements for circulators in Ordinance 2020-1033.  *See* Jan. 25, 2022, Hearing Tr. (Court: "[W]hat you are saying is that Trent Pool didn't file, or didn't circulate petitions because the city didn't circulate petitions because the city didn't assure him in advance that it wouldn't ask him to come to Houston to answer questions about those petitions? Is that what you're arguing?"  Plaintiffs: "No. No. Because at that time, Your Honor, this new ordinance would not have even come into being."  The Court: "All Right.  So what you're saying is that the city wouldn't give him assurance that it wouldn't enforce the invalid [Charter] under *Buckley* arguments."  Plaintiffs: "That is right.").

'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021). "[T]o establish standing, a plaintiff must show (1) that he suffered an injury in fact that is concrete, particularized and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* In *Pool*, the Fifth Circuit held that the Pools had suffered an injury for purposes of establishing standing. *See* 978 F.3d at 311. "'[C]hilling a plaintiff's speech'—and circulating petitions is speech—'is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Id.* (internal citation omitted) (quoting *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014)).

The Supreme Court recently addressed whether a request for nominal damages could satisfy the redressability element necessary for Article III standing. *See Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). In that case, the plaintiff, Chike Uzuegbunam, was distributing written religious materials when a college campus police officer informed him of a campus policy prohibiting the distribution of religious materials and instructed him to stop. *Id.* at 796. Uzuegbunam visited the Director of the Office of Student Integrity to learn about the policy. He was informed that the policy prevented the distribution of materials or speech about religion outside two designated "free speech expression areas," and that a permit was required for speech activities in the designated areas. *Id.* at 796–97. Uzuegbunam obtained a permit, but after he began speaking during his allotted time for his permit-allowed religious speech, another campus police officer instructed him that he would have to stop because of student complaints. The officer threatened to take disciplinary action against Uzuegbunam if he continued his speech, because, according to the officer, Uzuegbunam was prohibited from using the free-speech zone to say

41

anything that "disturbs the peace and/or comfort of person(s)." *Id.* at 797. Uzuegbunam sued, alleging that the campus speech policies violated the First Amendment.

A second plaintiff, Joseph Bradford, also sued. Although the college's policies had not been applied to Bradford as they had to Uzuegbunam, Bradford alleged that his religious speech had been chilled because the college's actions toward Uzuegbunam had deterred him from speaking about his religion.

The Court "h[e]ld only that, for purposes of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right." *Id.* The Court wrote that "it [was] undisputed that Uzuegbunam experienced a completed violation of his constitutional rights when respondents enforced their speech policies against him." *Id.* at 802. The Court did not reach the same conclusion for Bradford, because the Court could not, on the record before it, conclude that Bradford had suffered a "completed violation of his constitutional rights." Relevant here, the Court did not decide "whether Bradford c[ould] pursue nominal damages." The Court wrote, "Nominal damages go only to redressability and are unavailable where a plaintiff has failed to establish a past, completed injury. The District Court should determine in the first instance whether the enforcement against Uzuegbunam also violated Bradford's constitutional rights." *Id.*

The *Uzuegbunam* Court declined to address the argument the City raises here, that periods of allegedly chilled speech, without an incident of enforcement, can be redressed by nominal damages. *Uzuegbunam* holds only that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Id.* The question left open by *Uzuebunam* is whether a policy limiting speech, without an incident

of enforcement, is a "completed violation of a legal right" that can be redressed by nominal damages.

This court does not need to answer this question.  Even assuming that allegedly past chilled speech, without an incident of enforcement, can be redressed by nominal damages, the plaintiffs have not plausibly alleged that their speech was chilled.  To state a plausible First Amendment claim based on chilled speech, the plaintiffs must allege that they did not circulate petitions out of subjective and objectively reasonable fear that the City would enforce the unconstitutional Charter provisions against them.  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.");  *cf. Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018) ("[A] chilling effect amounts to a cognizable First Amendment injury only if it is 'objectively reasonable'—that is, if the challenged government action is 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" (citation omitted)).

Since *Uzuegbunam*, at least one district court has held that "[t]here are times when parties may be entitled to nominal damages for past periods of chilling effects."  *Global Impact Ministries v. Mecklenburg Cnty.*, No. 3:20-cv-232, 2021 WL 982333, at *3 (W.D.N.C. Mar. 16, 2021).  In that case, the court determined that the plaintiffs had pleaded plausibly a claim for nominal damages for past periods of chilled speech, because the plaintiffs had "allege[d] facts supporting that the threats of enforcement forced Plaintiffs to refrain from carrying out their [First amendment-protected activities]."  *Id.* (emphasis added).  Here, the plaintiffs have not alleged that the City threatened to enforce the unconstitutional Charter provisions against them. To the extent

43

that the plaintiffs subjectively perceived such a threat, that perception was not objectively reasonable.

The plaintiffs argue in their response to the City's motion to dismiss and their motion for summary judgment that they "had their speech chilled during at least three discrete periods prior to and during the litigation of this case, and this is an actualized injury entitling them to nominal damages." (Docket Entry No. 76, at 26; Docket Entry No. 85, at 27).  The plaintiffs do not identify when these "three discrete periods were" in either their complaint or in any of their briefs.  The plaintiffs alleged in their amended and earlier complaints that they wanted to circulate petitions during three election cycles: 2019, 2021, and 2022.  If the plaintiffs seek nominal damages, or any relief, for periods before 2019, they do not say so in their complaint.

The plaintiffs' speech—circulating petitions—was not chilled in 2019.  The plaintiffs originally brought this lawsuit in 2019 seeking temporary, preliminary, and permanent injunctive relief.  The district court entered a temporary restraining order enjoining the City from enforcing the residency and voter registration requirements with respect to petitions they circulated between July 1, 2019 to July 9, 2019.  (Docket Entry No. 20).  After the petition deadline passed, the district court dismissed the Pools' claims and closed the case, because "[a]t the [TRO] motion hearing, the parties agreed that Plaintiffs' claims would be moot at the expiration of the circulation period." (Docket Entry No. 20).  The second amended complaint alleges that Trent Pool was unable to circulate his anti-corruption petition "until the TRO was entered on July 1," and that "[t]his self-censorship constitutes actualized injury to Pool's First Amendment rights for which he seeks at least nominal damages."  (Docket Entry No. 64, at 9).   But the Pools were able to circulate their petition, because, as they admit, the district court entered an injunction on July 1, 2019.  They

44

received meaningful relief, in the form of an injunction, permitting them to circulate their anti-corruption petition in time for inclusion on the 2019 ballot, without any threat of enforcement of the Charter provisions.  There was no "completed violation of a legal right" in 2019.

The plaintiffs also alleged that they planned to place an initiative on the "November 2021 or 2022 Houston general election ballot."  (*Id.*, at 10).  The November 2021 cycle has passed. There is no evidence or allegation that the plaintiffs altered any plans to circulate a November 2021 or 2022 initiative on the general election ballot, in light of the unconstitutional Charter provisions.  *Cf. Benham v. City of Jackson*, Case No. 3:19-CV-911, 2021 WL 6010936, at *12 (S.D. Miss. Dec. 17, 2021) (denying nominal damages for past harm when, "[a]lthough [the plaintiff] expressed specific intent to travel to the City, this court has before it no evidence (such as airplane tickets) to show that [the plaintiff] altered any specific travel arrangements due to the Ordinances.").  The plaintiffs did not ask the court for any relief so that they could circulate a petition in 2021, despite the Charter provisions, suggesting no subjective fear of enforcement.  And any fear that the unconstitutional Charter provisions would be enforced against the plaintiffs during the 2021 election year would have been objectively unreasonable.  Even before the plaintiffs amended their complaint, the City had represented that it would not enforce the unconstitutional Charter provisions against them.  (*See, e.g.*, Docket Entry No. 66-4, at 3–4 (TRO Hearing) ("[W]e have told [the plaintiffs] we do not intend to enforce any provision that essentially the Supreme Court has found to be unconstitutional.")).  Although the City has not overcome its heavy burden to show mootness by demonstrating that there is no reasonable possibility that the City could or would enforce the unconstitutional Charter provisions in the future, the City's actions since this

45

lawsuit was initially filed have, at minimum, made clear to an objectively reasonable person that the City would not enforce the Charter provisions at least during the course of this litigation.

The plaintiffs have not plausibly alleged a completed violation of their First Amendment rights to warrant nominal damages. Even assuming that chilled speech, absent an incident of enforcement, can be redressed by nominal damages, the plaintiffs have not plausibly alleged that their ability to circulate petitions in the past has been chilled. As the Fifth Circuit stated in *Pool*, this lawsuit is about preventing the future enforcement of unconstitutional Charter provisions. A declaratory judgment provides relief for potential future harm, not nominal damages. The plaintiffs' claim for nominal damages is dismissed.

### D.    Liberty Initiative Fund's Claim for Compensatory Damages

Liberty Initiative Fund is the only plaintiff that seeks compensatory damages. (Docket Entry No. 64, at 25). Liberty Initiative Fund alleges that it is planning to organize "an initiative petition to amend the Houston Code of Ordinances to prohibit non-citizen voting in Houston for either the 2021 or 2022 Houston general election ballot." (Docket Entry No. 64, at 10). Liberty Initiative Fund's claim for compensatory damages is far from clear. It appears from the complaint that the Fund plans to hire Accelevate2020, another plaintiff, to aid in gathering signatures for this future petition, and that Accelevate2020 will allegedly charge $.50 more for signatures collected after August 21, 2021. Liberty Initiative Fund alleges that "the continuing delay in the resolution of Plaintiffs' rights under the First and Fourteenth Amendment is causing [Liberty] economic damages in excess of $10,000." (*Id.*, at 25).

Liberty Initiative Fund did not circulate a petition in 2021. It incurred no damages in 2021 because of Accelevate2020's increased rates for petitions circulated after August 21, 2021. The

plaintiffs admit as much, noting that "[t]he opportunity to have the measure on the ballot in 2021 has passed," but that the Fund "may stand to suffer the same damages if the matter is not resolved sufficiently in advance of the time to get it on the 2022 ballot." (Docket Entry No. 76, at 25). Liberty Initiative Fund has not yet incurred damages, despite its allegation that "the continuing delay in the resolution of Plaintiffs' rights . . . is causing [Liberty Initiative Fund] economic damages in excess of $10,000." (Docket Entry No. 64, at 25).

As the City correctly argues, Liberty Initiative Fund pleads that it will suffer damages "because *one plaintiff* is allegedly going to charge *another plaintiff* a higher price to collect signatures after August 21, 2021," not for any injuries caused by the defendants. (Docket Entry No. 68, at 35 (emphasis in original)). And, as the plaintiffs concede, whether damages are incurred is a function of how quickly this court resolves the lawsuit, because "if the suit is resolved soon enough, then these damages will never materialize." (Docket Entry No. 76, at 25). "Here, the purported damages *did not* occur because Houston somehow prohibited [Liberty Initiative Fund] from hiring circulators: it is because [Liberty Initiative Fund] apparently insists upon using Accelevate2020 for their circulating activities," and Accelevate2020 charges different rates depending on the time of year that it collects signatures. (*Id.* (emphasis in original)).

The harm that Liberty Initiative Fund alleges might occur based on another plaintiff's fee schedule is too speculative, attenuated, and distant from any conduct by the City to be recoverable. "A plaintiff who establishes a deprivation of a constitutional right actionable under § 1983 is entitled to recover compensatory damages for all injuries that" are "a direct and foreseeable result of the defendants' wrongful conduct." *See Doyle v. Landry*, 67 F. App'x 241, 2003 WL 21108487, at *3 (5th Cir. 2003). Liberty Initiative Fund has not suffered damages that are a "direct and

47

foreseeable result of the defendants' wrongful conduct." The City's motion to dismiss Liberty Initiative Fund's claim for compensatory damages is granted.

## IV.    Conclusion

The City's motion to dismiss is granted in part and denied in part. (Docket Entry No. 65). The court grants the City's motion to dismiss the plaintiffs' claims for preliminary and permanent injunctive relief, nominal damages, and Liberty Initiative Fund's claim for compensatory damages. The plaintiff's state-law claim as to Ordinance 2020-1033 is also dismissed. The plaintiffs' motion for summary judgment is granted in part and denied in part. (Docket Entry No. 85). The court grants the plaintiffs' claim for a declaratory judgment that the challenged Houston Charter provisions are unconstitutional. The plaintiffs' constitutional challenges to Ordinance 2020-1033 are dismissed, without prejudice. The City must inform this court and the plaintiffs if it intends to amend or enact a new ordinance in light of this opinion by no later than **April 18, 2022**. The plaintiffs may amend their complaint within 21 days of the City Council's enactment of a new ordinance, if they so choose.

SIGNED on February 22, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge